Matter of Adonnis M. (Kenyetta M.) (2021 NY Slip Op 03322)





Matter of Adonnis M. (Kenyetta M.)


2021 NY Slip Op 03322


Decided on May 26, 2021


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on May 26, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
VALERIE BRATHWAITE NELSON, JJ.


2018-09755
2018-09756
 (Docket No. K-3847-18)

[*1]In the Matter of Adonnis M. (Anonymous). Administration for Children's Services, respondent; Kenyetta M. (Anonymous), appellant; Rising Ground, nonparty-respondent.


Larry S. Bachner, New York, NY, for appellant.
James E. Johnson, Corporation Counsel, New York, NY (Fay Ng and Anna Wolonciej of counsel), for respondent.
Janet E. Sabel, New York, NY (Dawne A. Mitchell and Patricia Colella of counsel), attorney for the child.



DECISION & ORDER
In a proceeding pursuant to Family Court Act article 10, the former foster parent appeals from (1) an order of the Family Court, Queens County (Diane Costanzo, J.), dated July 31, 2018, and (2) a permanency hearing order of the same court also dated July 31, 2018. The order granted the motion of the attorney for the child to remove the child from the former foster parent's care and place him in the same foster home as his half-sibling. The permanency hearing order, insofar as appealed from, set the permanency goal as "placement for adoption with the . . . child's sibling's foster parent."
ORDERED that the order is affirmed, without costs or disbursements; and it is further,
ORDERED that the permanency hearing order is affirmed insofar as appealed from, without costs or disbursements.
Adonnis M. (hereinafter the child) was born in July 2016 and is the subject of this proceeding. Shortly after his birth, the child was placed in a non-kinship foster home which was not an adoptive resource. In January 2017, the child's mother was murdered. His father is unknown. When the child was one year old, he was placed in the non-kinship foster home of the appellant, Kenyetta M. (hereinafter the foster mother), who wishes to adopt him. The child's older half-sibling, a sister, was born in October 2009, and lived with a paternal grandmother until the grandmother's death. Thereafter, she was placed in a kinship foster home with her godmother, Jamila C. (hereinafter the godmother). The child and the half-sibling share the same mother, and the child was adjudicated to be destitute under Family Court Act § 1092(a). This adjudication provided the Family [*2]Court with the authority to direct that he be placed with his sibling so long as such placement was in the best interest of the child and the half-sibling (see Family Ct Act § 1095[e][3]). Subsequently, the godmother filed for custody of the child. In late February 2018, the attorney for the child moved by order to show cause for an order directing that the child be placed in the same foster home as his half-sibling. The foster mother also filed for custody of the child and the half-sibling.
In an order dated June 2, 2017, the Family Court, New York County, scheduled a permanency hearing for September 15, 2017. The case languished amidst adjournments and delays, including the transfer of the child's case from the Family Court, New York County, to the Family Court, Queens County, so that the hearing that was ultimately held, and the order that arose from it, did not occur until July 31, 2018.
On July 24, 2018, seven days prior to the hearing and issuance of the orders appealed from, the Administration for Children's Services (hereinafter ACS) and Rising Ground agreed that the child would visit his half-sibling at the godmother's home for the next three consecutive weekends, and that thereafter, the child would be placed with the godmother beginning on August 20, 2018. Therefore, by the time the permanency hearing was conducted on July 31, 2018, an agreement was already in place that the child would be placed, within less than a month, with the godmother. According to the attorney for the child, the reason for proceeding in this manner was to keep the child and his half-sibling together, and the child's three weekends of visitation at the godmother's home were to assist with the transition of the child from the foster mother's home to the godmother's home. The agreed-upon arrangement was subject, of course, to the scheduled permanency hearing at the Family Court.
As relevant to the disposition of this appeal, the Family Court conducted a hearing on all of the pending applications on July 31, 2018, which was attended by the parties, including the foster mother. Evidence at the hearing included a report from Rising Ground that the child should reside with his half-sibling. ACS urged that the child and half-sibling reside together with the godmother. Both ACS and the attorney for the child urged the court to free the child for adoption, with the godmother as the adoptive resource. Significantly, the foster mother, who was given notice and an opportunity to be heard, agreed that the child and half-sibling should be kept together, while further explaining that the child and half-sibling would be better off if placed with her. The foster mother emphasized that the child had already lived in her home for 6 months, that she had 10 years' experience providing foster care, that the child knew her as "mom," that the child's life had been stable with her, and that the foster mother's family and friends had helped her with the child. The foster mother had a full and fair opportunity to present her arguments in favor of having the child placed with her.
In an order dated July 31, 2018, the Family Court granted the motion of the attorney for the child and directed that the child be placed with the godmother for the reasons stated on the record. At the July 31, 2018 hearing, the court found both the foster mother and the godmother "entirely suitable," but noted that the half-sibling's father would only consent to the half-sibling living with the godmother and not with the foster mother. The permanency order of the same date directed, inter alia, that the child remain in the custody of ACS with a permanency goal of adoption with the godmother. Therefore, the court directed that the child and the half-sibling be placed with the godmother as the only practical permanent solution for keeping the children together. The foster mother appeals from both orders. We affirm.
Contrary to the foster mother's contention, the Family Court, by having placed the child in the custody of ACS, maintained jurisdiction over the child (see Family Ct Act § 1088; Matter of Jamie J. [Michelle E.C.], 30 NY3d 275, 283-284).
Also contrary to the foster mother's contention, the placement of the child with the godmother was not against the child's best interests. In fact, the child's placement for adoption with the godmother was clearly in the child's best interests. Specifically, the child's mother was deceased, his father is unknown, and the half-sibling is the child's only known living relative. Thus, placement with the godmother is fully consistent with the strong public policy of keeping siblings [*3]together (see Family Ct Act §§ 1027-a, 1095[e][3]). This important element, combined with the fact that the child resided with the foster mother for less than one year beginning when he was only one year old, that the half-sibling's father would not consent to the half-sibling being placed anywhere other than with the godmother, whom the Family Court found to be "entirely suitable," and that the child and the half-sibling had been bonding during their visits, collectively demonstrate that the Family Court's determination was supported by a sound and substantial basis (see Matter of Kadi W. v ACS-Kings, 167 AD3d 757, 758; Matter of Christopher P. v Jason Sidney G., 126 AD3d 980; Matter of Roberta W. v Carlton McK., 112 AD3d 729, 730). We recognize that in this case, as with many others that arise in the Family Courts, decisions are sometimes difficult, delicate, and weighty. Given the sound and substantial basis underlying the court's determination here, it is not the role of this Court to interfere.
At its essence, this appeal presents a circumstance where everyone involved—the foster mother, the godmother, the attorney for the child, ACS, and the Family Court—agreed that the child and his half-sibling should be kept together. The court found that both the godmother's home and the foster mother's home were entirely suitable, but in choosing between the two, properly noted that the half-sibling's father did not consent to the half-sibling being placed anywhere except with the godmother. The court's consideration of that fact did not mean that the child's best interests were not globally considered, but was instead a relevant and necessary fact that the court needed to take into account in determining how to best promote the child's best interests and the obvious benefit to him of keeping the two half-siblings together as each other's sole living, known, biological relatives. It was not error for the court to do so, and in fact, the court would have been derelict in its duties had it failed to do so.
Much of the history recounted by our dissenting colleagues does not relate directly to the matters on appeal. This appeal does not include or involve the joinder of the child's and the half-sibling's cases in a single venue, the original appointment of a single attorney to represent the interests of the child and the half-sibling, the permanency goal for the child's adoption, or the Family Court's order denying the foster mother's parallel petition for the custody of both children. Moreover, the foster mother's argument that the court erred in failing to sua sponte appoint a separate attorney for the child at the permanency hearing on July 31, 2018, was not raised as an issue before that court, and is therefore unpreserved for appellate review (see Matter of Quinones v Quinones, 139 AD3d 1072, 1074).
Contrary to the foster mother's further contention, she was not denied her own right to counsel when the Family Court declined to adjourn the July 31, 2018 hearing. During an earlier court appearance, the foster mother informed the court that she had counsel but he was unable to appear on that day. When the foster mother appeared on July 31, 2018, without counsel, she requested an adjournment to obtain new counsel. The court reminded her that the matter had been scheduled for a permanency hearing for several months and that at a court appearance in June 2018, she specifically told the court that she had retained an attorney. When the court stated that "the court did explain to you that it would be incumbent upon you to have [your retained attorney] or any attorney of your choosing available on your next court date," the foster mother did not disagree or dispute that the earlier instruction had occurred. The court denied the adjournment request for counsel, not only because the foster mother had failed to heed the court's earlier directive, but also because the case had been languishing and the matter had been awaiting a permanency hearing for several months. Under the circumstances of this case, we find that the court providently exercised its discretion in denying the foster mother's request for an adjournment to obtain new counsel (see Matter of Logan R. [Manuel R.], 168 AD3d 946, 947; Matter of Tavolacci v Garges, 124 AD2d 734, 736-737).
The foster mother's remaining contentions are without merit.
LASALLE, P.J, DILLON and DUFFY, JJ., concur.
BRATHWAITE NELSON, J., dissents, and votes to reverse the order dated July 31, 2018, and to reverse the permanency hearing order dated July 31, 2018, insofar as appealed from, [*4]and to remit the matter to the Family Court, Queens County, for a new determination in accordance with the following memorandum, in which BARROS, J., concurs:
I respectfully dissent because the record demonstrates that the Family Court failed to consider the best interests of the subject child separately and independently from those of his half-sister, and the court improperly gave substantial weight to the wishes of the half-sister's father, a person with no relation to the child and who was himself the subject of permanent neglect proceedings at the time the court rendered its determination. Accordingly, I would reverse the order dated July 31, 2018, and reverse the permanency hearing order dated July 31, 2018, insofar as appealed from, and remit the matter to the Family Court, Queens County, for a new determination as to the placement of the child.
The majority conflates the proceedings leading to these appeals, resulting in a confusion of the manner in which the permanency hearing arose, notice to the parties, and the position of the appellant and Rising Ground, the foster care agency into whose care the Administration for Children's Services (hereinafter ACS) had placed the child with the goal of adoption by the appellant.
The child was born in July 2016 in Queens. Shortly thereafter, in August 2016, he was removed from his mother's care due to neglect. The identity of the child's father is unknown, and the child was placed in non-kinship foster care. On January 10, 2017, the child's mother was murdered in Atlanta, Georgia. ACS attempted but was unable to find a relative or prospective caregiver willing or able to provide care for the child. As of January 25, 2017, the goal for the child became to move him to a pre-adoptive home, as his current placement could not lead to adoption. For the child's well-being, he remained in the non-adoptive home until a pre-adoptive home could be found and ACS could move to free the child for adoption.
In June 2017, ACS commenced a proceeding pursuant to Family Court Act article 10-C in the Family Court, New York County, to have the child declared a destitute child so that he could be freed for adoption. At the initial court proceeding, ACS advised the court that the child had a seven-year-old half-sister who shared the same mother. The half-sister had previously been placed in a separate foster home with her paternal grandmother due to the mother's neglect. The half-siblings had never been placed together. The half-sister's grandmother had subsequently died and she was then being cared for by her father, who had been in and out of her life up to that point. ACS had explored the half-sister's family as a possible option for the child, but the half-sister's father had resolutely declined to care for the child. Consequently, on June 2, 2017, the Family Court, New York County, issued a preliminary order temporarily placing the child in the care of ACS, with the goal of finding and placing him in a pre-adoptive home.
As a result, the child was placed in the pre-adoptive foster home of the appellant on July 31, 2017, with the goal of adoption by her. The proceeding came before the Family Court, New York County, again on September 15, 2017, and it was noted that the only reason there had been a delay in permanently placing the child with the appellant was because of the need to obtain the mother's death certificate. The child was doing well in the appellant's care. The court found the child to be a destitute child (see Family Ct Act §§ 1092[a][2][i], 1095[b]), and placed him in the care and custody of ACS pursuant to Family Court Act § 1095(d)(1). The goal was for the child to be adopted by the appellant. ACS represented, however, that it would need an original copy of the mother's death certificate before the child could be freed for adoption, and so the court issued the necessary order and the proceeding was adjourned to February 28, 2018, for the next permanency hearing.
In the meantime, a neglect proceeding was commenced against the half-sister's father in Queens County, and in October 2017, the half-sister came to live with a foster mother who purportedly was her godmother. The record contains no documentation of the relationship between the half-sister and her foster mother. The half-sister's foster mother had no prior relationship with the child, was not his godmother, and did not come forward as a resource for him until well after he was placed with the appellant for the purpose of adoption. Upon learning of the proceedings [*5]concerning the child, the half-sister's foster mother moved to have the destitute child proceeding transferred from New York County to Queens County in order to consolidate the proceedings concerning the two children, with a goal of placing both children in her home. By order dated February 16, 2018, the Family Court, New York County, transferred the destitute child proceeding to Queens County.
Although ACS had not opposed the transfer of the destitute child proceeding to Queens County, it did not initially agree to place the child with the half-sister's foster mother, as the child, then less than two years old, had been placed with the appellant specifically with the understanding that he would be adopted by her, and he had been in her home for nine months, since July 2017. ACS initially took the position that a relationship should be established between the foster parents and the children. The half-sister had another sibling who had been adopted and ACS was trying to establish that relationship for her as well.
For reasons not explained on this appeal, once the destitute child proceeding was transferred to Queens County, the attorney who had represented the child in New York County, and who had advocated for the child's placement with the appellant, no longer represented the child. Instead, the attorney who was representing the half-sister began representing the child. That attorney moved to direct ACS to explore the half-sister's foster mother as a foster parent for the child and to place the child in the half-sister's foster mother's home. Despite being appointed to represent the child's interests, that attorney did not meet the child or the appellant, or visit their home, explaining that the child was "an infant so it's not like [she] would be interviewing him and asking for his opinion." Rather, the attorney decided to "substitut[e] judgment" and asked the court to place the child with the half-sister's foster mother, with whom she was acquainted. As observed by ACS, the attorney for the child appeared to have negatively pre-judged the appellant without having met her or the child.
Contrary to the majority's finding, there had been no agreement amongst all involved in this proceeding prior to the July 31, 2018 hearing that the child and the half-sister should be placed together. Rising Ground did not endorse moving the child to the half-sister's foster mother's home. In addition, the matter had not been scheduled for a permanency hearing for months. Rather, it was resolution of the motion of the attorney for the child to direct ACS to move the child that had been pending for months. Among other reasons, including that the child had no connection with the half-sister's foster mother, there was confusion as to whether the court was authorized to make such a directive and whether ACS could transfer the child without Rising Ground's consent. As is evident by the need of a motion to compel ACS to place the child with the half-sister's foster mother, ACS did not initially agree to the placement. However, during the pendency of the motion, ACS eventually came to agree that the child should be moved to reside with his half-sister, as he had no other biological family. Rising Ground, the foster care agency into whose care ACS had placed the child, however, disagreed, and ACS believed that Rising Ground's consent was needed in order for ACS to move the child from the appellant's home because the child had been declared destitute and placed with appellant for the purpose of adoption. ACS thus believed that a court order was needed to effect the transfer. The attorney for the children also sought the court order, as opposed to having ACS move the child administratively, so as to prevent the appellant from being able to seek an administrative hearing and a stay of the transfer of the child.
The appellant appeared at a proceeding on June 26, 2018. She had hired an attorney to file a petition for adoption of the child, but he was not present that morning due to a scheduling conflict. The appellant argued that the Family Court should not remove the child from her care. In addition to their bond, she noted that the child had been in her care for longer than the half-sister had been in her foster mother's care, and the appellant had been facilitating sibling visits. She asked the court to consider what was in the child's best interests, which she believed were with her, and suggested that a hearing on the motion of the attorney for the child should be held if the court were considering removing the child from her care. The court indicated that it would prepare a written decision on the pending motion. Subsequently, however, the court asked the attorneys for ACS and the children to prepare legal memoranda addressing the authority of the court to grant the relief sought by the attorney for the children.
On July 23, 2018, the attorney for the children, ACS, the half-sister's foster mother and her attorney, and a representative of the foster care agency who represented the half-sister appeared in the Family Court on the motion. Neither Rising Ground nor the appellant were notified of the court date, and, thus, neither appeared in court that day. After discussing the court's authority to direct placement of the child, it was discovered that an order had not been issued in the destitute child proceeding when it was in New York County. The court determined, therefore, that the best way to proceed would be to conduct a permanency hearing on the destitute child petition, which the court then scheduled for the following week. The court stated that it would not reach out to the parties to notify anyone of the date, but that anyone who appeared would have the right to participate and be heard.
The following week, on July 31, 2018, precisely one year after the child had been placed with the appellant, the Family Court held permanency hearings on the neglect petition and the destitute child petition. Although the appellant and a representative of Rising Ground appeared in court, presumably on the still-pending motion of the attorney for the child, neither had been notified that the destitute child proceeding was scheduled for a permanency hearing that day. The appellant asked the court for an adjournment in order to obtain counsel, as the attorney who she had hired to handle the adoption proceeding informed her that he would not represent the appellant in the proceeding then before the court. The court denied her request.
In the neglect proceeding, ACS sought to change the permanency goal for the half-sister to free her for adoption by her foster mother, as her father had not engaged in services, had not visited her since the neglect proceeding was filed, and had not had any meaningful contact with ACS. The attorney for the father had not spoken with the father for "some time," but believed that the father was not opposed to the half-sister's continued placement with her foster mother. The attorney for the half-sister's foster mother previously confirmed that they had not had contact with the father for "a long time." The Family Court changed the goal for the half-sister to be adoption.
In the destitute child proceeding, since Rising Ground was unaware that a permanency hearing would be held that day, it had not prepared a permanency hearing report for the child. Rising Ground reported that on July 24, 2018, ACS directed Rising Ground to place the child with another foster care agency, the agency that had care of the half-sister and that had advocated for placing the child in the home of the half-sister's foster mother. Based upon the discussion on the record at the July 23, 2018 proceeding, it appears that ACS did this to obviate the need to obtain Rising Ground's consent to the transfer. Contrary to the finding of the majority, the record does not reflect Rising Ground's agreement to the transfer. To the contrary, prior to the July 31, 2018 proceeding, Rising Ground had consistently opposed the transfer. Its July 31, 2018, report merely reflected that ACS had made a decision to transfer the child out of Rising Ground's care and that, pursuant to that decision, the child was scheduled for a series of visits and then, ultimately, placement with the half-sister's foster mother.
In connection with the ACS directive, Rising Ground had prepared a letter updating the Family Court and the attorneys on the child's progress. As to the well-being of the child, Rising Ground reported that he was doing well in the appellant's care and was "extremely attached to her." The court gave the appellant an opportunity to be heard on the request to have the child placed with the half-sister's foster mother. She was proceeding pro se since the court had denied her request for an adjournment to obtain counsel. When the appellant started to speak, the court interrupted and established that the children should be placed together, and, therefore, narrowed the issue before it to be "why it would be . . . contrary to the children's best interests to be placed together with [the half-sister's foster mother]." The appellant then spoke of how well the child was doing in her care, their bond, and the community support they enjoyed. The appellant stated that a deacon from her church was present at the proceeding, and the court again interrupted the appellant and stated that she needed to focus on the issue of both children and whether they should be placed with her or with the half-sister's foster mother. The appellant stated, inter alia, that the attorney for the children had not reached out to her or explored the bond or home environment with the child, and, instead, had told her that she did not have the right to participate in the proceeding. The appellant urged that the court should consider what was in the child's best interest and noted that the child knew her as [*6]"mom," was stable in her care, and had established family and community ties with her.
The Family Court found that the children should be placed together to accomplish the goal of permanency and to further their singular best interest, and that it would be easier for the child to transition to different care than the half-sister due to his age. The court also stated that its decision was determined in part by the fact that the half-sister's father would only consent to the half-sister being in the home of her foster mother, and "the court absolutely has to take into consideration how he feels and what his position is for his own child." Accordingly, in an order dated July 31, 2018, the court granted the motion of the attorney for the children to transfer the child to his half-sister's foster home. In a permanency hearing order, also dated July 31, 2018, the court, among other things, changed the permanency goal for the child to be adoption by the half-sister's foster mother. The appellant appeals from both orders.
The appellant's challenge to the procedure utilized by the attorney for the children in order to transfer the child's foster home is unpreserved for appellate review, as she did not raise the issue before the Family Court (see Matter of Lea E.P. [Jason J.P.], 176 AD3d 715, 716).
I agree with the appellant, however, that the Family Court erred by failing to consider the child's individual best interests separate from those of his half-sister. In any determination concerning the care and custody of a child, the court must, upon an evaluation of the totality of the circumstances, render a determination that is in the best interests of the child at issue (see Eschbach v Eschbach, 56 NY2d 167, 171; Matter of Tabitha T. S.M. [Tracee L.M.-Candace E.], 159 AD3d 703, 704; Matter of Ender M. Z. -P. [Olga Z.], 109 AD3d 834, 835; Matter of Vanisha J. [Patricia J.], 87 AD3d 696, 697). Courts and the legislature have recognized "that it is often in the child's best interests to continue to live with his siblings," because siblings "need each other's strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful" (Eschbach v Eschbach, 56 NY2d at 173 [emphasis added and internal quotation marks omitted]; see Family Ct Act §§ 1027-a[a] [directing that a child be placed with siblings at the time that she or he is removed from the home for alleged abuse or neglect]; 1095[e][3]). However, even where applicable, the rule is not absolute, and is only but one of several factors to consider in determining the best interests of the individual child (see Eschbach v Eschbach, 56 NY2d at 173; Matter of Tabitha T. S.M. [Tracee L.M.-Candace E.], 159 AD3d at 705; Matter of Ender M.Z.-P. [Olga Z.], 109 AD3d at 836). Here, the court erred in concluding that this factor outweighed any other consideration, particularly since the child and his half-sister had never been placed together, in part because the half-sister's family had refused to care for the child, resulting in his placement with appellant for the purpose of adoption (see Matter of Tabitha T. S.M. [Tracee L.M.-Candace E.], 159 AD3d at 705; Matter of Ender M.Z.-P. [Olga Z.], 109 AD3d at 836). The court also erred in giving weight to the purported wishes of the half-sister's father, who had no relationship to the child, had resolutely declined to care for the child, had neglected his own child, the half-sister, and had demonstrated neither ability nor interest in acting in the best in the interest of either child.
There is limited evidence in the record concerning the child's life in his foster home, as his attorney never met with the child nor with the appellant, and the Family Court erroneously curtailed the scope of the best interests inquiry. Nonetheless, the record demonstrates that the child was "extremely" bonded with the appellant, whom he had lived with for approximately one year, and he was healthy, happy, and well provided for in her home (see Matter of Tabitha T. S.M. [Tracee L.M.-Candace E.], 159 AD3d at 705; Matter of Ender M.Z.-P. [Olga Z.], 109 AD3d at 836), which is where he was placed for the express purpose of adoption after, inter alia, the half-sister's family had declined to be a resource for him. The record suggests that were it not for the complication of the mother's death occurring out of state and the additional time required to obtain an out-of-state certified death certificate, the destitute child proceeding would have reached the dispositional stage (see Family Ct Act § 1095[d]), where the child would have been adopted by the appellant, well before the half-sister's foster mother became involved and the proceeding was transferred to Queens County, where the attorney who advocated for the child's placement with the appellant was replaced with the half-sister's attorney who declined to even visit the child, the appellant, or their home. The court erred in determining that it was in the child's best interests to be transferred from the [*7]appellant's home to another foster home solely because his half-sister resided there (see Matter of Tabitha T. S.M. [Tracee L.M.-Candace E.], 159 AD3d at 705; Matter of Ender M.Z.-P. [Olga Z.], 109 AD3d at 836).
Under these circumstances, I would remit the matter to the Family Court, Queens County, to render a new determination as to the child's best interests, considering the totality of the circumstances as they pertain to him (see Matter of Amanda G., 64 AD3d 595, 596). I acknowledge, however, that some time has passed since the child was removed from the appellant's home, and the determination of his best interests would include the changed circumstances of those intervening years, and, therefore, the child should remain in the foster home of the half-sister's foster mother pending any such determination (see Matter of Schneiter v New York State Off. of Children & Family Servs., 154 AD3d 1283, 1286).
I also agree with the appellant that under the circumstances, the child should have been represented by his own attorney and not the attorney representing his half-sister, as he is entitled to the appointment of a separate attorney to represent his own interests, which may conflict with the interests of his half-sister (see Matter of Brian S. [Tanya S.], 141 AD3d 1145, 1147; Matter of James I. [Jennifer I.], 128 AD3d 1285, 1286; Corigliano v Corigliano, 297 AD2d 328, 329).
In light of these conclusions, I do not find it necessary to reach the appellant's remaining contentions.
ENTER:
Aprilanne Agostino
Clerk of the Court